**GRAPHIC SCIENCES, INC.,**
**Plaintiff,**

v.

**INTERNATIONAL MOGUL MINES**
**LIMITED, et al., Defendants.**

**Civ. A. No. 74–1188.**

United States District Court,
District of Columbia.

Oct. 18, 1974.

C. Roger Nelson, Washington, D. C., for plaintiff.

Sidney Dickstein, Washington, D. C., for defendants.

## MEMORANDUM–ORDER

GASCH, District Judge.

### I. *The Claim.*

This is a suit for injunctive relief based upon alleged violations of the Securities Exchange Act of 1934, as amended, and rules promulgated thereunder. In general, plaintiff Graphic Sciences, Inc. (Graphic) claims that defendants were and are engaged in a conspiratorial attempt to seize control of Graphic. Graphic alleges that the means employed to achieve this end have been in violation of United States securities laws.

Plaintiff asserts that false and misleading statements were made on a Schedule 13D filed by defendants International Mogul Mines, Ltd. (Mogul) and Canadian Vendbar Industries, Ltd.

(Vendbar) in connection with their purchase of Graphic common stock. The Schedule 13D is required by law to be filed in connection with any securities transaction which will cause the filer to be the beneficial owner of more than five percent of the class of security concerned.[1] Graphic also contends that the Schedule 13D was not filed within the time specified by law. Plaintiff makes the further representation that false and misleading statements have been made in connection with a tender offer for Graphic stock (15 U.S.C. § 78n(d), (e)(1970)) and in connection with the sale or purchase of Graphic stock (15 U.S.C. § 78j(1970)).

The matter is now before the Court on Graphic's motion for a preliminary injunction. For purposes of this motion, the Court will not consider the claims regarding tender offers and the purchase or sale of stock. The material furnished by counsel to the Court in support of the motion related almost exclusively to alleged violations of 15 U.S.C. § 78m(d). Accordingly, the Court will limit its consideration of issues on this motion to those raised in connection with the latter statute.

Pending trial on the merits (set for November 18, 1974), Graphic seeks to enjoin defendants from: 1) Further purchase or acquisition of Graphic stock; 2) Solicitation of proxy or other voting rights; 3) Voting their stock holdings; 4) Filing false or misleading documents with the SEC; 5) Failing to file required documents with the SEC; 6) Employing any device to defraud or

1. 15 U.S.C. § 78m(d) (1970). The text of the statute reads in relevant part as follows:

(d) (1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title, . . . is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background and identity of all persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, . . . ;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the name and address of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

\* \* \* \* \*

(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

\* \* \* \* \*

This provision is section 13(d) of the 1934 Act, as amended. The "Schedule 13D" is a form required by the SEC to fulfill the filing commandment of the statute. The content of that form is set out at 17 C.F.R. § 240.13d–101.

making any untrue statements in connection with the purchase or sale of stock; 7) Employing any device to defraud or making any untrue statements in connection with a tender offer; 8) Disposing of any Graphic stock except by unsolicited, open-market sales which are not prearranged; 9) Acting in furtherance of the conspiracy to acquire control of Graphic.

Defendants deny that there has been any violation of the securities laws. They deny any intent to take control of Graphic, merge it, sell its assets or in any way change its corporate structure. Although they did not so contend in their answers, defendants at the hearing and subsequently have raised the defense of "unclean hands" claiming that it would bar any relief herein. This defense is based upon new salary and employment arrangements between Graphic and certain of its officers, certain statements in the annual report and proxy statement regarding Mogul's intent, a change in the membership of Graphic's Board and a finder's fee arrangement with certain members of Graphic's Board.

### II. Standards for a Preliminary Injunction.

■ The factors to be considered by the Court in determining the suitability of interlocutory injunctive relief are: 1) Whether the petitioner has shown that it is likely to prevail on the merits; 2) Whether the petitioner has shown that irreparable harm would follow denial of the requested relief; 3) Whether issuance of an injunction would substantially harm other parties interested in the proceedings; 4) Where lies the public interest. *Virginia Petroleum Jobbers Assoc. v. Federal Power Comm.*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

■ Plaintiff would have the Court use a different standard, one apparently in use in the Second Circuit. According to that standard, plaintiff would be entitled to a preliminary injunction if there were either: 1) A showing of probable success plus possible irreparable injury; *or* 2) Sufficiently serious questions raised, going to the merits, as to make them a fair ground for litigation plus a balance of equities tipping decidedly toward the plaintiff.[2] Even if the Court agreed with the Second Circuit formulation, it would not feel at liberty to adhere to it in light of the frequent and recent reiteration of the rule of *Virginia Petroleum Jobbers, supra,* by the Circuit Court of Appeals for the District of Columbia.[3]

■ The Court recognizes that the preservation of the status quo is central to the grant of a preliminary injunction and that the public interest factor may be a key one.[4] By the same token, the Court recognizes that a preliminary injunction can only be justified where the Court "makes a considered judgment of a probability of success on the merits."[5] This does not mean that plaintiff must establish its case to a certainty at this point. All that need be shown is a reasonable probability of success on the merits.[6]

What constitutes a reasonable probability of success will of course be different for the circumstances of individual

2. *Sonesta Int. Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 250 (2d Cir. 1973).

3. *E. g., Asher v. Laird,* 154 U.S.App.D.C. 249, 475 F.2d 360 (1973); *Murray v. Kunzig,* 149 U.S.App.D.C. 256, 462 F.2d 871 (1972), *rev'd on other grounds sub nom., Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

4. *Delaware & H. R. Co. v. United Transp. Union,* 146 U.S.App.D.C. 142, 159, 450 F.2d 603, 620, *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

5. *Wheelabrator Corp. v. Chafee,* 147 U.S. App.D.C. 238, 249, 455 F.2d 1306, 1317 (1971).

6. *Delaware & H. R. Co. v. United Transp. Union,* 146 U.S.App.D.C. 142, 158, 450 F.2d 603, 619, *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

cases. In the words of Chief Judge Bazelon,

> The likelihood of success on the merits that a movant for injunctive relief must demonstrate varies with the quality and quantum of harm that it will suffer from the denial of an injunction.[7]

Thus, where all other factors are in the plaintiff's favor, it may well be sufficient to raise serious and substantial questions going to the merits. As Judge Frank said:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.[8]

Where it considers a request for temporary relief, therefore, a court is required to be both prescient and passible. The Court must be passible because it must be sensitive to the factors set forth in *Virginia Petroleum Jobbers, supra.* It must balance harms to the parties, determine the existence of irreparable harm and seek the public interest. The Court must be prescient because it must predict, at an early stage of the case, the plaintiff's chances for ultimate success. It must do so with a feeling for the nuances introduced by the peculiar facts of each case. All these things the Court must accomplish while mindful that the primary use of temporary relief is to preserve the status quo until more deliberate investigation can better determine the rights of the parties. With these principles as guides, the Court turns to the facts of this case.

### III. *Facts.*[9]

#### A. *The Parties.*

Plaintiff Graphic Sciences, Inc., is a New York corporation engaged primarily in the business of development, production and marketing of equipment under the trade name "dex." Dex equipment is used to transmit and receive facsimiles of graphic and written materials over ordinary telephone lines. Graphic, as of June 30, 1974, had cash and marketable securities in the aggregate amount of approximately $20 mil-

---

7. *District 50, U.M.W. v. International Union, U.M.W.*, 134 U.S.App.D.C. 34, 37, 412 F.2d 165, 168 (1969) (Bazelon, C. J.).

8. *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) (Frank, J.). *See* 7 J. Moore, *Federal Practice,* ¶ 65.04[1] at 65–39 (1974). It should be noted that:

> The principle is, of course, as broad as the substantive law, and individual cases must be determined in light of the substantive principles to be applied.

*Id.* at 65–41.

The rule stated by Judge Frank receives support from the opinion of Chief Judge Bazelon quoted *supra*, note 7, and accompanying text. The opinion there quoted goes on to indicate that the probability of success must be shown to a reasonable certainty in a case in which the other equities do not favor plaintiff. *See District 50, U.M.W. v. International Union, U.M.W.*, 134 U.S.App.D.C. 34, 37, 412 F.2d 165, 168 (1969).

9. Unless otherwise noted, all facts recited have been gleaned from the various affidavits filed herein. The Court has had the benefit of three affidavits from each of the following persons: Gul Hira, Chairman of the Board of Graphic; Robert K. Dombrowski, President of Graphic. Two affidavits have been received from Walter C. King, a Senior Vice President (Finance) and a Director of Graphic. One affidavit has been received from each of the following: F. Gerald Townsend, President, Chief Operating Officer and a director of Mogul, a director of Vendbar, President and a director of Coldstream; David W. Knight, Chairman of the Board of Mogul and of Coldstream, President and a director of Vendbar; Stephen D. Fuller, an allegedly "unaffiliated" member of Graphic's Board of Directors; Paul Fuller, brother of Stephen D. Fuller and participant with him in a meeting with Messrs. Townsend and Knight; Justian deFrias, a British employee of a British subsidiary of a Canadian subsidiary of Interscan (which is itself a subsidiary of Coldstream).

lion and had no long-term or short-term debt (other than normal accounts payable). Two of Graphic's officers, Gul Hira (Chairman of the Board) and Robert K. Dombrowski (President) figure in this case.

The corporate defendants are International Mogul Mines, Ltd. (Mogul), Canadian Vendbar Industries, Ltd. (Vendbar), Coldstream Mines, Ltd. (Coldstream) and Draper Dobie & Co., Ltd. (Draper). Draper is a Canadian brokerage firm. The other corporate defendants are Canadian corporations organized under the laws of Ontario Province. Vendbar is a wholly-owned subsidiary of Mogul. Mogul is primarily engaged in the mining business and controls over 50 firms. It is itself controlled by Coldstream which holds a 38.2 percent interest in Mogul. Mogul, in turn, holds a 15.8 percent interest in Coldstream. Coldstream itself, however, is controlled by David W. Knight (a defendant herein) and members of his family. This family group, through the estate of Mr. Knight's father and through shareholdings in two private companies, controls an aggregate of approximately 49.5 percent of the outstanding shares of Coldstream.[10] Draper was active in acquiring Graphic shares for Mogul and Vendbar.

For purposes of this motion the Court need specifically identify only two of the 18 named individual defendants. David W. Knight is Chairman of the Board of Mogul and of Coldstream and is President and a director of Vendbar. He is a resident of Canada. F. Gerald Townsend is President, Chief Operating Officer and a director of Mogul. He is President and a director of Coldstream and Vice-President and a director of Vendbar. Townsend is also a Canadian resident. The remaining individual defendants are officers or directors of one or more of the three principal corporate defendants (Mogul, Vendbar, Coldstream).

While they are not actually parties to this action, it will clarify matters to identify three other corporations which are involved in the facts giving rise to this case. GCL Graphic Communications, Ltd. (GCL), an Ontario corporation, holds the right to distribute dex equipment in Canada. The distribution of dex in the United Kingdom and Ireland is done by Interscan-Dex, Ltd. (Interscan-Dex), an English company. Interscan-Dex is controlled by GCL, which holds a 51 percent interest. The remaining 49 percent interest is held directly by Coldstream.

Indirectly, however, Coldstream controls both GCL and Interscan-Dex. GCL is a subsidiary of Interscan, Ltd. (Interscan), which holds a 79.6 percent interest in GCL. Interscan itself is a subsidiary of Coldstream, which owns outright a 72.7 percent interest in Interscan and has the right to acquire the remaining 27.3 percent interest. Coldstream, through Interscan, GCL and its own direct holdings, has effective control of 100 percent of Interscan-Dex.[11]

### B. *Chronology.*

Although the precipitating factor of this litigation was the filing of the Schedule 13D on July 22, 1974, the genesis of the case has deeper roots. A better understanding of the case will be obtained by a chronological statement of the train of events which eventually led to this litigation.

Coldstream and Mogul have had a major involvement with Graphic since about mid-1973. At about that time, Coldstream committed itself to expenditure of substantial sums to GCL in order to penetrate the facsimile market. GCL, as stated *supra*, was the distributor of dex equipment in Canada and (through its subsidiary Interscan-Dex)

10. The information regarding the corporate structure of defendants is from the Schedule 13D filed by Mogul and Vendbar with the SEC (July 22, 1974).

11. Schedule 13D filed by Mogul and Vendbar with the SEC on July 22, 1974.

in Britain and Ireland. GCL is directly controlled by Interscan, the subsidiary of Coldstream.

Almost from the start there were serious differences between the Coldstream group and Graphic's management. Coldstream disagreed with Graphic's sales and pricing policy. It apparently objected to Graphic's failure to spend on research and development. In general, the feeling at Coldstream was that Graphic management was ignoring the long-term for the short-term view. These dissatisfactions were expressed at various times to Graphic personnel.

On January 30, 1974, at Townsend's request, a meeting was held between representatives of the Coldstream group and representatives of Graphic. The meeting was attended by Hira, Dombrowski and other Graphic officials. Townsend was present, together with other representatives of Mogul and its affiliates. Townsend requested that Graphic make "some form of credit arrangement to help GCL through the first few years of its distributorship operations, since it always takes a few years before such an operation can have a positive cash flow." [12] Graphic contends, and it is not contravened by defendants, that the "form of credit arrangement" sought was a $6 million cash loan (characterized as a long-term equipment purchase loan) from Graphic to GCL. Coldstream, however, was not willing to guarantee the loan. After a review of GCL's financial status, which it determined to be very poor, Graphic rejected the loan request.

Another meeting took place on March 27, 1974, between Knight and Townsend, representing the Coldstream group, and Hira. At this meeting Hira was informed of the purchase by Mogul of some 140,000 shares of Graphic stock (of approximately three million shares outstanding). Such a holding is some 10,000 shares below the five percent (5%) limit after which the law requires the filing of a Schedule 13D.[13] Knight and Townsend also suggested that GCL be merged into Graphic, with Graphic issuing to Coldstream a substantial block of Graphic stock. Further, the Coldstream-Mogul representatives expressed displeasure with the president of Graphic, Dombrowski, leaving Hira with the belief that they expected their own people to run Graphic after the merger with GCL. Defendants claim that this impression was erroneous, although they admit criticism of Dombrowski's "autocratic rule." [14]

On March 29, 1974, Hira met with one Michael Moss, a New York City stockbroker who claimed to control a substantial number of Graphic shares. Moss expressed unhappiness with the current Graphic management and wanted it changed at the highest levels. Moss revealed a detailed knowledge of the March 27, 1974, meeting and indicated that he had recently met with Townsend. Moss stated that his group would like to see Coldstream take over Graphic. Defendants admit to a series of contacts with Moss and do not deny a meeting with him between March 27, 1974, and March 29, 1974.

On April 4, 1974, a meeting was held at the offices of Moss. Attending the meeting were Moss, Knight, Townsend and several stockbrokers. No Graphic representatives attended. The persons in attendance at that meeting were shareholders of Graphic. Knight, Townsend and others again voiced their complaints about Graphic management. Graphic asserts that each stockbroker present was asked by Moss to give his estimate of the number of Graphic shares controlled by him or by those he represented. This is not contravened by defendants. Defendants, however, char-

---

12. *Townsend Affidavit* at 11.

13. 15 U.S.C. § 78m(d)(1) (1970).

14. *Townsend Affidavit* at 12.

acterize the April 4, 1974, meeting as merely a "gripe session." [15]

Subsequent to the meeting of April 4, 1974, Knight and Townsend maintained their contacts with Moss by means of several meetings and telephone calls. Defendants state that these meetings and conversations were limited to a sharing of complaints and misgivings over the "non-policies" [16] of Graphic management.

Thereafter, on April 10, 1974, Townsend and Knight met with Stephen D. Fuller at Fuller's offices in New York City. Fuller is a non-management member of Graphic's Board of Directors. The meeting was also attended by Fuller's brother, Paul Fuller, who is active in the investment community and shares offices with Stephen Fuller. Mr. Stephen Fuller's firm was the underwriter for GCL. Again Townsend and Knight lamented the misguided policies of Graphic's management. They found Fuller "far more responsive" to their plaints than were Hira and Dombrowski and thought that he seemed to concur with their views. [17] Defendants assert that nothing was said respecting intent to obtain Graphic stock and that no effort was made to enlist Fuller's aid in an attempt to take over Graphic. Stephen Fuller, however, states that the Coldstream group's intent to seek control of Graphic was made quite clear and further states that his support was sought for the takeover attempt. Paul Fuller confirms his brother's statements. The Fullers, however, waited until July 25, 1974, to tell Dombrowski and Hira of the meeting.

Meanwhile, Graphic was investigating the possibility of merger with GCL which had been proposed at the meeting of March 27, 1974. A study of GCL was carried out by Graphic. The study included meetings in London between Hira and other Graphic officials and representatives of the GCL operations in Britain (including Mr. Townsend). On the basis of this study, Graphic management concluded that GCL was in poor financial shape and that the proposed merger would be unwise. Accordingly, Graphic's Board rejected the merger idea. This rejection was conveyed to Townsend by letter dated May 8, 1974. The letter also stated that Graphic would consider the acquisition of GCL's distributor rights for Canada and the United Kingdom. No reply was received to this letter or to the offer it contained.

Also on May 8, 1974, a meeting took place at the offices of Interscan-Dex in Hounslow, Middlesex, England. Attending were Arthur Davidson, an official of the British Post Office Corporation, Francis R. Jacques, Marketing Manager of Interscan-Dex, Justian deFrias, then Sales Manager of Interscan-Dex, and other officials of Interscan-Dex. The British Post Office Corporation administers the British telephone system and has authority to grant or refuse permission to use the telephone lines in Britain. During that meeting, Jacques asserted that control of Graphic would shift to Interscan.

After this spate of activity, matters remained quiet until the filing of the Schedule 13D on July 22, 1974. During the period from January 30, 1974, to July 22, 1974, however, officials of the Coldstream group and of GCL had several times attempted to obtain lower prices for dex equipment. The prices suggested by them were substantially lower than those provided for in the contract between GCL and Graphic. The management of Graphic deemed these suggested prices to be unreasonably and imprudently low and refused to accept them.

Between July 10, 1974, and July 19, 1974, Mogul and Vendbar undertook a

---

15. *Knight Affidavit* at 5.

16. *Townsend Affidavit* at 10.

17. *Id.*

series of purchases of Graphic stock.[18] After these purchases, the two companies had acquired outright 104,700 shares of Graphic stock and had obtained an option to acquire a further 195,690 shares. This, combined with the more than 140,000 shares already held by the Coldstream group, means that as of July 22, 1974, Coldstream and its affiliates beneficially owned or had a right to acquire approximately 450,400 shares of Graphic.[19] Since these acquisitions caused them to hold in excess of five per cent of Graphic's stock, Mogul and Vendbar filed the requisite Schedule 13D.

The Schedule 13D stated that the funds used to purchase this stock came from Mogul's general corporate funds.[20] No mention was made of the source of funds to be used if the option to purchase stock were exercised. In Item 4 of the Schedule 13D, the interests of Mogul, Vendbar, and Coldstream in dex

18. The transactions were as follows:

Open market purchases

| Date of purchase | Purchaser | No. of shares | Purchase price per share ($US) |
|---|---|---|---|
| July 10, 1974 | Mogul | 1,000 | 6½ |
| " | " | 5,000 | 6⅝ |
| " | " | 5,000 | 6¾ |
| " | " | 15,600 | 7 |
| " | " | 1,400 | 7 |
| " | Vendbar | 1,000 | 7 |
| July 11, 1974 | Mogul | 400 | 7 |
| July 12, 1974 | " | 1,000 | 7½ |
| " | " | 3,200 | 7⅝ |
| " | " | 2,800 | 7¾ |
| " | " | 2,400 | 8 |
| July 15, 1974 | " | 4,850 | 8¼ |
| " | " | 8,350 | 8⅜ |
| July 16, 1974 | " | 1,300 | 8⅛ |
| " | " | 4,400 | 8¼ |
| " | " | 7,800 | 8½ |
| " | " | 5,600 | 8⅞ |
| " | " | 2,700 | 8⅝ |
| July 18, 1974 | " | 10,000 | 9 |
| July 19, 1974 | " | 750 | 8½ |
| " | " | 1,600 | 8¾ |
| " | " | 7,300 | 8⅞ |
| " | " | 11,250 | 9 |

Acquisition of option

Reference is made to Item 5 for particulars of an option acquired by Mogul on July 16, 1974, to acquire 195,690 common shares of the Issuer.

See "Schedule B" submitted as an attachment to Schedule 13D filed by Vendbar and Mogul on July 22, 1974. Thus, in a ten-day period, Mogul and Vendbar acquired some 104,700 shares of Graphic stock and an option to acquire 195,690 more shares.

19. *See* Schedule 13D (filed July 22, 1974), Item 5 at 6–7. The cost of acquisition of these shares was $2,109,000.00. *Id.*, Item 3 at 3. An additional $97,845.00 was spent to acquire the option to purchase the further 195,690 shares. *Id.*, Item 5 at 6. Eventually ownership of all shares will be transferred to Mogul. *Id.*, Item 3 at 3.

20. *Id.*, Item 3 at 3.

equipment and its future were recited. It said that the companies wished to make an investment in this area. It then went on to state:

> Accordingly, Mogul has acquired the interest in common shares of the Issuer described in Item 5 below in the expectation that this share interest will enable Mogul to make a positive contribution to the management of the Issuer. Mogul expects to request that its designees be appointed to the board of the Issuer.
>
> If Mogul is able to make a contribution to management of the Issuer or if its representatives are elected to the board, it may well influence decisions of the Issuer with respect to the conduct of its business. Through Coldstream and its interest in GCL and Interscan-Dex, Mogul has a continuing business relationship with the Issuer in which the business interests of the Issuer and Mogul are not and will not necessarily be the same in respect of such matters as length of distribution rights, purchase price payable for equipment and other terms inherent to a distribution agreement. Any influence of Mogul on the management of the Issuer with respect to this business relationship will be exercised within applicable laws.[21]

No mention was made in Item 4 of any intent to take control of Graphic, change its corporate structure, merge it, sell it, seize its assets or the like. Plaintiff contends that such intent existed and should have been declared.

Item 5 of the Schedule 13D recited the respective holdings of Mogul, Coldstream and Vendbar in Graphic. It failed to state whether any of defendants' officers or directors held or had a right to acquire Graphic stock. It did, however, recite the transactions in Graphic stock (within the 60 days pre-ceding the filing of the Schedule 13D) by Coldstream, Vendbar, Mogul or their subsidiaries, officers, directors or affiliated persons. Item 5 also recites the existence of the option to purchase further Graphic shares at $9.25 per share and states:

> If at any time on or prior to August 23, 1974 [expiration date of the option agreement] an offer is made by anyone to all the shareholders of [Graphic] to purchase all or a portion of the issued shares of [Graphic] at a purchase price per share in excess of $9.25, the purchase price per share for the optioned shares shall be increased by an amount equal to such excess.[22]

After the filing of the Schedule 13D, a meeting was held on July 25, 1974, in Knight's suite in a New York City hotel. Present were Knight, Townsend, Hira, Dombrowski and their counsel. At the meeting Knight and Townsend proposed changes in Graphic's nine-member Board of Directors. At that time the Board was made up of five officers of Graphic, a partner of the law firm serving as General Counsel to Graphic, and three persons not affiliated with Graphic save as Directors.[23] Knight and Townsend wished to place four nominees on the Board. To achieve this, they suggested that three of Graphic's officers and the attorney for Graphic resign from the Board. Defendants contend now that this proposal was negotiable and that they might have been satisfied with less than four persons on Graphic's Board. Moreover, they assert that only two of their proposed members would represent Mogul's interests while the other two would be independent businessmen.

Graphic contends, and it is not controverted by defendants, that all four of the Mogul nominees would have been selected by Mogul. Mogul also rejected Graphic's proposal that the Board be ex-

---

21. *Id.*, Item 4 at 5–6.

22. *Id.*, Item 5 at 7. At the hearing herein counsel stated that the option expired unexercised.

23. Stephen D. Fuller was one of these unaffiliated Directors.

panded to thirteen persons and that Mogul have its four seats thereon. The effect of the Mogul proposal, then, would have been to create a Board on which were two management members, four Mogul nominees and three unaffiliated Directors.[24] At the same meeting the Graphic representatives were told of Mogul's intent to exercise its option to buy additional Graphic stock.

Events again began to move swiftly. On July 25 and July 31, 1974, Stephen D. Fuller informed Graphic management of the meeting he had had with Townsend and Knight. On August 5, 1974, the instant suit was filed. On August 7, 1974, Graphic entered into employment contracts with Messrs. Hiranandani, Joffre and King, all of whom are currently Directors and officers of Graphic.[25] These contracts are terminable by either party upon 90 days written notice at any time after April 30, 1975, and provide an annual remuneration

which is apparently greater than that which those officers are currently receiving.[26] At about the same time John W. Butterworth, an officer of Graphic, became a Director of the corporation in place of one of the unaffiliated directors.[27]

In September, 1974, Graphic issued an annual report and a notice of its annual stockholders' meeting (to be held on October 31, 1974). These documents revealed that either of the two remaining unaffiliated Directors could receive remuneration for the reasonable value of his services if he acted as intermediary in an acquisition or merger between Graphic and another firm.[28] The documents also indicate that Graphic may be seeking friendly acquisition by, or merger with, another firm.[29] The Annual Report revealed the filing of a Schedule 13D, stating the views of Graphic management regarding the intent underlying that filing and discussed this action.[30]

24. Townsend and Knight had already met with one of the unaffiliated Directors, Fuller, and apparently found him responsive to their criticisms of Graphic. *See* note 17, *supra*, and accompanying text.

25. *Notice of Annual Meeting of Graphic Stockholders dated September 18, 1974* (filed in Court on Sept. 24, 1974), at 5–6. [Hereinafter cited as Annual Meeting Notice.]

26. *Id.*

27. *Id.* at 3–4. Stephen D. Fuller, however, remained on the Board. *Id.*

28. *Id.* at 6. The agreement was apparently reached in May, 1974.

29. *Annual Report of Graphic Sciences, Inc., for Year Ended June 30, 1974* (filed in Court Sept. 24, 1974), at 2. The Report states:

From time to time the management of Graphic Sciences has had discussions with a number of companies regarding the possible acquisition of those companies by Graphic Sciences. Similarly, the management of Graphic Sciences has had discussions with several companies concerning the possible acquisition of Graphic Sciences. Your company's management con-

tinues to explore such opportunities as they arise, and will keep you advised of any substantive developments in this regard.
*Id.*

30. *Id.* at 1–2, 15. The Report stated:
As we previously advised our stockholders, International Mogul Mines Limited, a Canadian mining company, and one of its subsidiaries recently filed a Schedule 13D with the U.S. Securities and Exchange Commission in which they indicated that they had acquired in excess of 5% of Graphic Sciences' common stock. Graphic Sciences believes that the Schedule 13D filing contains, among other things, materially false and misleading statements and omissions as to the purpose of Mogul Mines and its subsidiary in acquiring that stock and that, in fact, they seek control of Graphic Sciences. Your company believes that Mogul Mines, its subsidiary and other affiliates have violated the U.S. securities laws and, therefore, on August 5, 1974, your company instituted a lawsuit in the Federal District Court in Washington, D. C. seeking appropriate injunctive relief. That lawsuit is presently pending. We will keep you advised of all important developments.
*Id.* at 1–2.

The Court has set trial on the merits herein for November 18, 1974.

## IV. *Applicable Law.*

■ Graphic has, for purposes of this motion, dropped its claims relative to deception in connection to tender offers and in connection with the purchase or sale of securities. The Court, therefore, has only to consider at this time the issues of misleading and false information on a Schedule 13D and late filing of the Schedule 13D. As a preliminary matter, the Court notes that its jurisdiction over this matter seems clear.[31] Venue is appropriately in this District.[32] There is no question but that there has been proper service.

■ Any person making an acquisition of a security registered under the 1934 Act, which acquisition results in that person being the beneficial owner of more than five per cent (5%) of a class of such security, is required by statute to file with the SEC within ten days after such acquisition a statement containing certain specified information and such other information as may be required by SEC rules and regulations.[33] The term "person" includes corporations and other business entities.[34] When two or more persons act as a partnership, syndicate or other group in order to acquire securities of an issuer, such a syndicate or group is a "person" for the purposes of the filing requirements.[35]

■■ The Securities Exchange Act of 1934 is remedial legislation and is thus to be broadly construed in order to give effect to its intent.[36] The intent of the Act is to protect investors, the markets and the public generally by means of full disclosure. *See, e. g., Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *Mosinee Paper Corp. v. Rondeau,* 500 F.2d 1011 (7th Cir., 1974); *Corenco Corp. v. Schiavone & Sons, Inc.,* 488 F.2d 207 (2d Cir.

Later the Report asserted:

> 4) International Mogul Mines Limited ("Mogul Mines") and its wholly-owned subsidiary, Canadian Vendbar Industries Limited ("Vendbar") filed a Schedule 13D with the U.S. Securities and Exchange Commission on or about July 22, 1974 wherein Mogul Mines and Vendbar indicated that they had acquired in excess of 5% of the Company's Common Stock. The Company believes that the filing by Mogul Mines and Vendbar contains, among other things, materially false and misleading statements and omissions regarding Mogul Mines' and Vendbar's purpose in acquiring the Company's stock and that, in fact, they seek control of the Company. The Company believes that Mogul Mines and Vendbar and other affiliates have violated the U.S. securities laws and, accordingly, on August 5, 1974 the Company instituted a lawsuit in the U.S. District Court in Washington, D. C. seeking appropriate injunctive relief. That lawsuit is presently pending.

*Id.* at 15.

31. 15 U.S.C. § 78aa (1970).

32. *Id.* The alleged violations took place here when the Schedule 13D was filed with the SEC.

33. 15 U.S.C. § 78m(d)(1) (1970). The text of this statute is set forth, *supra*, at note 1.

34. 15 U.S.C. § 78c(a)(9) (1970).

35. 15 U.S.C. § 78m(d)(3) (1970). Once such a group is formed, a filing is required. There is no need to show intent to acquire more stock. *GAF Corp. v. Milstein,* 453 F. 2d 709, 716–18 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Voting control is the only relevant element of beneficial ownership. *Id.* at 716; *Bath Industries, Inc. v. Blot,* 427 F.2d 97, 112 (7th Cir. 1970). The existence of an agreement, formal or otherwise, to act as a group is essential and must be shown. *Corenco Corp. v. Schiavone & Sons, Inc.,* 488 F.2d 207, 217 (2d Cir. 1973).

36. *See Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Speaking for the Court in construing the Act, Mr. Justice Brennan said:

> [W]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors through the requirement of full disclosure . . . .

*Id.*

1973); *Bath Industries v. Blot*, 427 F.2d 97 (7th Cir. 1970). The Court, then, will construe the Act broadly in light of its purpose.

 Such a broad construction is utilized in the definition of the word "control" as used in the Act. The term is defined, not in the statute but in the Regulations, as follows:

> The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.[37]

This definition clearly indicates that the notion of control is not limited to cases in which a person has or seeks ownership of a majority interest in an issuer's securities or majority representation on a board of directors. The realities of commerce are determinative. Acting working control is the key, whatever may be the basis for that control.[38]

 The Regulations of the SEC require that the purpose of the transaction be stated on the Schedule 13D.[39] If the purpose of the transaction, or one of the purposes, is to acquire control of the issuer's business, the purchaser of the securities must state fully any plans to liquidate or merge the issuer, sell its assets or make any other major change in its business or corporate structure.[40] It is here that Graphic claims that Mogul failed to make a proper revelation. Mogul, of course, disclaims any intent to seek control and declares that its inten-

tions were fully set forth in the Schedule 13D which it filed.[41]

 Item 5 of the Schedule 13D requires that the filing person set forth the number of shares of the issuer which it owns or has a right to acquire.[42] The same information is required of each associate of the filing person.[43] Where, as here, the filing person is a corporation, the information requested in Item 5 must be given with respect to each officer and director of such corporation and each person controlling such corporation.[44]

## V. *Conclusions.*

### A. *Probability of Prevailing on the Merits.*

 A violation of the securities laws is clear on the face of the Schedule 13D. Mogul and Vendbar did not set forth in their filing the holdings of their officers and directors in Graphic stock. As has been shown, such disclosure is required.[45] The statement that these officials had no holdings, as was later asserted by defendants,[46] is immaterial in light of the requirement that negative answers (or a contention that an item is inapplicable) be set forth.[47] Defendants have thus failed to comply with the clear terms of the securities laws.

Moreover, in addition to this clear violation, the Court regards as serious the uncontroverted facts so far revealed by the parties herein. The Court's recitation of the undisputed facts shows: 1) A heavy investment by defendants in the plaintiff firm; 2) Great dissatisfaction, openly and frequently avowed, by defendants with Graphic's policies; 3)

37. 17 C.F.R. § 12b–2(f) *made applicable to Schedule 13D filings* by 17 C.F.R. § 240.-12b–1.

38. *See* 2 L. Loss, *Securities Regulation* 770–83 (2d ed. 1961).

39. 17 C.F.R. § 240.13d–101 (Item 4).

40. 15 U.S.C. § 78m(d)(1)(C) (1970); 17 C. F.R. § 240.13d–101 (Item 4).

41. The Schedule 13D is quoted *supra* at note 21 and accompanying text.

42. 17 C.F.R. § 240.13d–101 (Item 5).

43. *Id.*

44. 17 C.F.R. § 240.13d–101 (Note B).

45. *Id.* (Item 5), (Note B).

46. *Knight Affidavit* at 7.

47. 17 C.F.R. § 240.13d–101 (Note A).

A series of meetings by defendants' highest officials with persons in the investment community who controlled blocks of Graphic stock during which, at the very least, sharp criticisms were made of Graphic management; 4) At the same time as the meetings with investors, and after significant purchases of Graphic stock, defendants' top management met twice with Graphic officials to urge upon them major business endeavors which would be beneficial to defendants (suggested loan to GCL, suggested merger with GCL and issuance of Graphic stock to Coldstream, suggested pricing policy which would have favored GCL); 5) A stock purchasing program which left defendants just below the five percent limit for some time and then brought them over the limit with an extremely rapid acquisition of large amounts of Graphic stock in a very short period (about ten days) at a cost of thousands of dollars. It is also worthy of note that the buying period began on a Wednesday, thus giving defendants the longest possible time (12 days) before filing a Schedule 13D; [48] 6) A Schedule 13D which revealed the possible divergence in business interest between defendants and Graphic in language that was, at best circumlocutory; [49] 7) An option to purchase more stock that recited in agreed price but also set forth an agreement to pay a higher price should anyone, during the life of the option, make a tender offer for Graphic stock; [50] 8) A meeting very shortly after the heavy purchases of Graphic stock by Mogul between high officers of defendants and Hira of Graphic at which defendants requested profound changes in the composition of Graphic's Board (i. e., resignation of four management Directors from the nine-man Board and their replacement by designees of the defendants); 9) Contact between the highest level of defendants' management and at least one unaffiliated member of Graphic's Board.

The Court is of course aware of the protestations of defendants that these meetings were only innocent "gripe sessions" and that defendants merely sought to have a small and helpful voice in Graphic's counsels.[51] But the Court is not blind to commercial realities. It is highly unlikely that men of power and position such as Townsend and Knight would spend their time attending mere gripe sessions. It is unlikely that such a concerted stock-buying project would be undertaken merely to insure a minority·voice in company affairs. It is unlikely that requests for major changes

---

48. The ten days filing time expired on a Saturday (July 20), giving defendants until Monday (July 22) to file.

49. *See supra* note 21 and accompanying text.

50. *See supra* note 22 and accompanying text.

51. The Court recognizes the existence of a line of authority, apparently approved by our Circuit Court, that holds that the better practice is to refuse a preliminary injunction where there is a conflict of fact as recited in opposing affidavits and there were no witnesses presented at the hearing. *See, e. g., Sims v. Greene,* 161 F.2d 87 (3d Cir. 1947); *Securities and Exchange Comm. v. Frank,* 388 F.2d 486 (2d Cir. 1968); *Cerruti v. McCrory Corp.,* 438 F.2d 281 (2d Cir. 1971). *Accord Murray v. Kunzig,* 149 U.S. App.D.C. 256, 264, 462 F.2d 871, 879 (1972), *rev'd on other grounds sub. nom. Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Autera v. Robinson,* 136 U.S.App.D.C. 216, 221 and n. 26, 419 F.2d 1197, 1202 and n. 26 (1969) (dicta).

There were no witnesses presented at the hearing in this case. The Court, however, does not find this line of authority controlling here. The Court notes that it is basing its result herein not on the version of the facts set forth in the affidavits of one side or the other but on the undisputed facts as revealed by the affidavits of both parties. For example, the Court bases certain of its conclusions not on one side's assertion of what went on at certain meetings but on the fact of the occurrence of the meetings.

Thus the Court feels that its decision in this case comes within the first classification posited by Judge Friendly in *S.E.C. v. Frank, supra,* 388 F.2d at 490. There Judge Friendly noted that no witnesses need be heard where there is no dispute as to material facts. As will be seen, it is the Court's view that the undisputed facts herein give rise to serious questions on the merits.

in the Board of Directors would be made absent some power to back the request, coming as it did so soon after major stock purchases. It is unlikely that contacts with unaffiliated directors would be made merely to voice displeasure with management (especially when the addition of one director, plus their four designees, would give the Mogul-Coldstream interests control of Graphic's Board). It is unlikely that an option agreement would take account of a possible tender offer unless the parties had information regarding such an offer.

■ The likelihood of these things is not necessarily determinative of this case, however. Based on what has been shown, the Court concludes that the undisputed facts herein have raised questions going to the merits which are "so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberative investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) (Frank, J.). The Court believes that this case is squarely within the rule enunciated by Judge Frank in *Hamilton Watch, supra.* Thus, if the other equities favor Graphic, it is not necessary that its case be at this stage proved to a certainty. Graphic has shown at least a serious question regarding defendants' intent.

■ Before considering the other equities, however, the Court must briefly deal with the defense of "unclean hands" raised by the defendants. The doctrine of "clean hands" is not a rigid one. It is committed to the sound discretion of the court and its purpose is to advance justice. *Precision Instrument Mfg. Co. v. Automotive Maint. Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944). The doctrine is rooted in the ancient idea that equity is an instrument for affirmatively enforcing the requirements of conscience and good faith. *Precision Instrument Mfg. Co., supra*, at 814, 65 S.Ct. 993. It closes the doors of equity to one who has acted inequitably or with bad faith relative to the matter in which he seeks relief. *Id.* It does not require that one be blameless in regard to other matters, but does require that one seeking relief shall have acted fairly and without fraud or deceit as to the controversy at issue. *Id.* at 814–15, 65 S.Ct. 993.

■ The defendants in this case urge that the statements made by Graphic in its annual report constitute bad faith so as to bring the plaintiff within the ambit of "unclean hands." The Court has reviewed these statements carefully.[52] It finds that these statements constitute no more than the views of Graphic management as expressed in this case. Those views are not expressed in an inflammatory or misleading way. Management certainly may express its views and do so in a restrained manner, as here. Such conduct does not constitute "unclean hands."

■ Defendants also complain of certain new salary arrangements for Graphic officers, stated in the notice of annual meeting, and of certain finder's fees contingently payable to certain directors.[53] The Court regards these measures as no more than reasonable and usual efforts by management to protect itself from, and defend against, a suspected takeover bid. The same is true of any attempt by Graphic to obtain a friendly merger. The Court does not think that these matters constitute "unclean hands."

### B. *Irreparable Harm.*

■ The Court finds a sufficient showing of threatened or existing irreparable harm herein. The lack of appropriate information has kept investors, actual and potential, either misinformed or uninformed regarding Graphic stock.

---

52. The statements are quoted *supra* at note 30 and accompanying text.

53. *Annual Meeting Notice* at 6.

The price of Graphic stock was doubtless affected by the actions of defendants so that manipulation of the stock price occurred. To refuse to issue a temporary injunction would be possibly to permit defendants to reap the benefits of their own wrongful action. Relief can and should be granted on a showing of such harm. *See Butler Aviation Intern. v. Comprehensive Designers, Inc.*, 425 F.2d 842 (2d Cir. 1970) *aff'g* 307 F. Supp. 910 (S.D.N.Y.1969) (actions causing price manipulation constitute irreparable harm); *S.E.C. v. Micro-Moisture Controls, Inc.*, 148 F. Supp. 558 (S.D.N.Y. 1957) (sale to public of unregistered stock constitutes irreparable harm); *S. E.C. v. Keith Richards Securities Corp.*, 148 F. Supp. 358 (S.D.N.Y.1957) (failure to keep proper financial records justifies temporary relief).

### C. The Public Interest.

■ The public has a clear interest in the efficient and effective operation of the securities laws. The laws exist for the protection of the public and serve to safeguard the economy from ills such as were visited upon it by the uncontrolled practices of the 1920's.[54] The Court recognizes that our economy, although a far cry from *laissez faire*, still depends in large part on individual initiative and the profit motive to generate production. These factors, then, should be permitted a relatively free play. Nonetheless, the policy of this country is that business shall function well within the safeguards and constraints of the securities laws. Any violation of these laws should bring swift remedial action. Any possible violation should be regarded with suspicion and fully investigated. The Court concludes that the public interest demands uniform and exacting enforcement of the securities laws and that policy encourages a thorough review of possible violations thereof. This is especially true where, as here, such an investigation would not interfere with the appropriate functioning of business. The public interest, therefore, is on the side of the plaintiff herein.

### D. Balance of Harms and Relief.

■ The Court well realizes that the function of equity is generally to deter rather than to punish[55] and that the preliminary injunction is best used to preserve the status quo.[56] It believes that relief can be so fashioned herein as to meet those twin goals. Further, it believes that relief can be so framed as to protect adequately Graphic until trial on the merits (set for November 18, 1974) yet visit no real harm upon defendants.

■ Because the Court thinks that there are serious questions here which demand answers, it would grant an order prohibiting defendants and any persons acting for or with them from acquiring any further interest in Graphic stock. It would further forbid defendants and any persons acting for or with them either to seek or solicit any proxies from other Graphic stockholders or to make any tender offer to other Graphic stockholders. The Court would, however, permit defendants to vote their shares or to dispose of them in any appropriate manner (so long as no defendant or any person acting for or with defendants acquired any shares beyond those now held). This relief would protect Graphic from any takeover bid based upon inadequate disclosures but would permit defendants to enjoy the legitimate fruits of their investment. Re-

---

54. *See Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (purpose of securities Acts is to protect investor); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969) (purpose of Congress in requiring disclosure in tender offer cases was to insure basic honesty and fair dealing).

55. *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

56. *Delaware & H. R. Co. v. United Transp. Union*, 146 U.S.App.D.C. 142, 159, 450 F.2d 603, 620; *cert. denied*, 403 U.S. 911, 91 S. Ct. 2209, 29 L.Ed.2d 689 (1971).

lief so fashioned would cause the balance of harms to favor plaintiff.

### E. *Summary*.

The Court finds that plaintiff has shown at least one clear violation of the securities laws (regarding holdings of corporate officers and directors). Plaintiff also at a minimum has raised questions going to the merits which are so substantial, difficult, serious and doubtful as to make them a fair ground for litigation and thus for a more thorough inquiry. The Court, indeed, believes that the facts herein support a finding that plaintiff has shown a reasonable probability of success on the merits.

Moreover, the Court thinks that the other equities favor plaintiff. A showing of irreparable harm has been made. The public interest is best served by inquiry into possible securities law violations. The balance of harms favors plaintiff. A preliminary injunction shall thus issue in accord with this opinion.