474 F.Supp. 1341 (1979)
CHROMALLOY AMERICAN CORPORATION, Plaintiff,
v.
SUN CHEMICAL CORPORATION, Norman E. Alexander, Jefferies & Company, Inc., Defendants.
No. 79-935C(3).
United States District Court, E. D. Missouri, E. D.
August 20, 1979.
*1342 *1343 Jim J. Shoemake, Guilfoil, Symington, Petzall & Shoemake, St. Louis, Mo., W. Stanley Walch, Michael D. O'Keefe, Thompson & Mitchell, St. Louis, Mo., co-counsel, Robert Pirie, Skadden, Arps, Slate, Meagher & Flom, New York City, Whitman & Ransom, New York City, for plaintiff.
Veryl L. Riddle, Thomas C. Walsh, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for Sun Chemical & Norman E. Alexander.
David R. Hyde, Thomas Kavaler, Cahill, Gordon & Reindel, New York City, for Sun & Alexander.
John R. Musgrave, Coburn, Croft, Shepherd, Herzog & Putzell, St. Louis, Mo., for Jefferies & Co., Inc.

MEMORANDUM
NANGLE, District Judge.
This case is now before the Court on plaintiff's motion for a preliminary injunction. Plaintiff brought this suit alleging violations of the Williams Act provisions of the Securities Exchange Act, 15 U.S.C. §§ 78m(d), 78n(d) and (e), the Missouri Take-Over Bid Disclosure Act, § 409.500 et seq. R.S.Mo. (1975), and § 203 of the Delaware General Corporation Law.
The verified complaint in this action was filed on August 1, 1979, and at that time Judge H. Kenneth Wangelin granted a motion for a temporary restraining order. A motion for expedited discovery was also granted, and a hearing was set for August 9, 1979. That hearing was subsequently rescheduled for August 14, 1979, at which time this Court held a hearing on the motion for preliminary injunction. Prior to that hearing, defendant Jefferies & Company, Inc. was dismissed by stipulation.
The hearing was held before this Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the extensive documentary evidence, and the stipulations of the parties, and being fully advised in the premises, makes the following findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
1. Plaintiff Chromalloy American Corporation ("Chromalloy") is a publicly held corporation organized under the laws of the State of Delaware with its principal place of business in Clayton, Missouri.
2. Defendant Sun Chemical Corporation ("Sun") is a publicly held corporation organized under the laws of the State of Delaware with its principal place of business in New York City.
3. Defendant Norman E. Alexander ("Alexander") is the principal stockholder, Chairman, and Chief Executive Officer of Sun. Alexander is a resident of Scarsdale, New York.
4. As of July 2, 1979 there were approximately 12,072,018 shares of Chromalloy common stock and 1,331,106 shares of $5 cumulative convertible preferred stock outstanding. Each share of preferred stock is convertible into 3.888 shares of common stock. At all relevant times, the common and preferred stock of Chromalloy have been registered for trading pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, and listed for trading on the New York Stock Exchange.
5. In fiscal year 1978, Chromalloy had net earnings of approximately $20 million and revenues of nearly $1.4 billion.
6. Sun is a considerably smaller corporation, having earnings of approximately $20 million in fiscal 1978, with revenues of approximately $394 million.
7. Alexander first became aware of the investment opportunities in Chromalloy in March of 1977. At that time he spoke with Donald Engel, a first vice president of Drexel Burnham Lambert, Inc. ("Drexel"), an investment brokerage firm. Engel informed Alexander that the 35% of the common stock held by insiders was not in a solid management block. Alexander responded that if 20% of the stock could be purchased on a friendly basis and Sun could *1344 get a seat on the board, it would be happy to do so.
8. Alexander was next contacted by Engel concerning Chromalloy on or about January 3, 1978, following the death of Joseph Friedman, the chairman of Chromalloy. The substance of the conversation was the same as that of the previous March.
9. On or about January 11, 1978 Alexander met with Engel and Irving Shepard, the new Chairman and Chief Executive Officer of Chromalloy. Shepard told Alexander that with a 10% purchase, Engel and Alexander could probably get swing votes on the board.
10. On January 16, 1978 Sun made its first purchase of Chromalloy stock, through Drexel. Drexel was informed that Sun desired to follow a steady course of purchases of Chromalloy stock. Drexel was instructed to buy a percentage of the daily volume, with no solicitation, no premiums, and no off-market purchases.
11. In April, 1978 Sun prepared an "Acquisition Model" designating Chromalloy as the "target". The computer analysis considered Sun's investment in Chromalloy at 20% and 100% levels.
12. In May, 1978 Sun employed Technomic Consultants to conduct a study of Chromalloy. Technomics was asked to consider Sun's position after a 20% purchase, and to recommend which divisions of Chromalloy were most feasible to sell off.
13. Around this same time, negotiations occurred between Sun and Chromalloy concerning a standstill agreement, by which Sun would agree to limit its purchases of Chromalloy in return for a board seat. In connection with these negotiations, Shepard had told Alexander to say nothing at the time about desiring to buy 20%. Nothing came of these negotiations.
14. A report prepared internally at Sun a short time later was entitled "Chromalloy Strategy". This report referred repeatedly to Sun's hypothetical position as a 20% stockholder of Chromalloy.
15. On or about July 24, 1978 Alexander announced his desire to obtain a seat on the board of Chromalloy. Such a position was not obtained.
16. On or about October 3, 1978 Alexander spoke with Disque Deane, an investment banker and director of Sun, regarding Sun's investment in Chromalloy. Deane said that Sun would get no market credit for controlling Chromalloy and should approach it as an investment. He also gave his opinion of the possibilities of selling off various divisions of Chromalloy. Alexander agreed that this was consistent with the programs which had been discussed, and opined that a profit could be realized for Sun if the trim-down was properly executed.
17. In November, 1978, in a registered public offering, Sun sold $40 million of debentures. Pursuant to Securities Exchange Commission regulations, a registration statement was filed which disclosed that a portion of the proceeds were to be used to purchase Chromalloy stock.
18. By the end of January, 1979 Sun had accumulated over 5% of Chromalloy's voting stock. On February 5, 1979 Sun filed a Schedule 13D, as required by Section 13(d) of the Securities Exchange Act, 15 U.S.C. § 78m(d). In this Schedule Sun stated that the purpose of the purchases was investment only and that, subject to market and economic conditions, Sun intended to increase its holdings. Sun disclaimed any knowledge of the amount of the expected increase, and disclaimed any intent to seek control. Sun also revealed that it had sought representation on the board, which request had not yet been granted.
19. On or about March 1, 1979 Alexander talked with Milford Bohm, a former director of Chromalloy. Bohm was planning to buy back the consumer services division from Chromalloy. Bohm stated that, after that transaction, he would like to join Alexander in any attempt to get control of the company.
20. On or about March 2, 1979 Alexander met with Robert Wright, a partner in Arthur Anderson & Co., Sun's independent accountants. At this meeting, Alexander gave four justifications for Sun's continuing *1345 investment in Chromalloy. First, Alexander was close to several board members and felt they might ask him to join the board and provide leadership. Second, Alexander hoped Chromalloy would eventually seek to acquire the assets of Sun. Third, Alexander felt there was a possibility that a dissident faction might approach him to assist in an attempt to take over leadership of the company. Lastly, Alexander said Chromalloy was a good investment.
21. On March 9, 1979 Alexander was nominated as a director from the floor at Chromalloy's annual meeting. His nomination was defeated. After the meeting Alexander spoke with Frank Nykiel, Vice Chairman of the Board, and Wesley Barta, Chairman and Chief Executive Officer, and offered to "take care of" them in return for their support in his gaining a position on the board.
22. On or about May 17, 1979 Alexander again expressed Sun's desire to eventually purchase 20% of Chromalloy's stock, this time in a conversation with Ira Harris of Solomon Brothers, investment bankers to Chromalloy.
23. By the end of March, 1979 Sun had acquired an additional 1% of Chromalloy stock. In early April, Sun filed its first amendment to Schedule 13D. The only disclosure new with respect to the purpose of the transaction was that Sun's request for board representation had been refused.
24. Around this time, negotiations again were conducted concerning a standstill agreement. Richard Grafer, of Arthur Anderson & Co., discussed this attempt with Stuart Krinsly, Executive Vice President and General Counsel of Sun. Krinsly stated that Sun felt it had seven members of the seventeen member board of Chromalloy supportive of their cause, with two others who would swing over if Alexander were on the board.
25. On June 25, 1979, Sun filed its second amendment to its Schedule 13D. Sun statements regarding its lack of intention to gain control of Chromalloy were reiterated.
26. On July 2, 1979 Sun filed its third amendment to its Schedule 13D. In this amendment Sun revealed that its Board had authorized the purchase of sufficient shares of Chromalloy to allow it to use the equity method of accounting, which is generally utilized after a 20% level has been achieved. Under such method, Sun would report as income a percentage of Chromalloy's income or losses equal to Sun's percentage ownership, regardless of the dividends paid on the stock.
27. On or about July 16, 1979 representatives of Sun met with representatives of Moody's Investor Services, a bond rating service to discuss the rating of a proposed debenture offering. At this meeting, Alexander was asked about Sun's dealings with Chromalloy and whether Sun's proposed 20% interest would represent control. Alexander responded that the deal would be done with Chromalloy's money or they would get out.
28. On July 25, 1979 Sun made a block purchase of 331,200 shares of Chromalloy stock through Jefferies & Co., a brokerage firm specializing in block purchases. The transaction involved no solicitation on the part of either Jefferies or Sun, no premium (¼th point above the last sale being considered within the normal range of prices), and no pressure on shareholders to sell. The stock was purchased from large institutional investors.
29. Several times Alexander has expressed his belief that he could control Leon Toups, a present director of Chromalloy, if Toups were to succeed Barta as Chief Executive Officer of Chromalloy, as well as his belief that he could control other members of the board also.
30. Recently Sun issued a prospectus concerning the issuance of $40 million in debentures. This prospectus reveals that the proceeds of the offering are to be used principally to purchase Chromalloy stock.
31. Throughout Alexander's dealings in relation to Chromalloy he has kept extensive memoranda which reflect his contemporaneous thoughts. These memoranda reveal that Alexander was concerned from the very start with the split on the board of directors and possible avenues to power. *1346 He continually kept track of which directors were on his side and which were hostile.
32. Throughout his dealings with Chromalloy directors, Alexander never stated an intention to control Chromalloy, to control the board of directors, or to make a hostile tender offer.
33. On August 6, 1979 Sun filed its fifth amendment to its Schedule 13D. In this amendment Sun revealed the prospective debenture offering as well as the filing of this suit by Chromalloy. Sun revealed the allegations contained in this suit, though denying them.
34. Jon W. Rotenstreich, a general partner in the investment banking firm of Solomon Brothers, testified that it was his expert opinion, based on the financial status of Sun, that a 20% interest in Chromalloy was a wise business decision only if Sun is attempting to gain control. He testified that based on a cash flow analysis, such an interest was not sensible merely from an investment point of view.
35. Plaintiff has demonstrated that there is a substantial likelihood that it will prevail on its claims that Sun has intended from the beginning to eventually purchase 20% of Chromalloy, to exercise extensive influence over the board of that corporation, and to exert control if possible.

CONCLUSIONS OF LAW
This Court has jurisdiction of this case pursuant to Section 27 of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78aa, and under the principles of pendent jurisdiction. Gibbs v. United Mine Workers, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The transactions complained of have occurred and, unless enjoined, will continue to occur in this district.
This case is presently before the Court on plaintiff's motion for a preliminary injunction. In this circuit, the traditional requisites to the issuance of a preliminary injunction are 1) substantial probability of success at trial by the moving party, and 2) irreparable injury to the moving party absent the issuance. Missouri Portland Cement Co. v. H. K. Porter, 535 F.2d 338 (8th Cir.1976). Recently, though, this circuit has moved toward the adoption of the standard applied in the Second Circuit, which states hat:
A preliminary injunction should issue upon a clear showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Fennell v. Butler, 570 F.2d 263, 264 (8th Cir.) cert. denied 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978).
The "balance of hardships" terminology incorporates the possibility of irreparable injury. Frejlach v. Butler, 573 F.2d 1026, 1027 n.4 (8th Cir.1978). Since the result would be the same in this case whichever test is applied, the more restrictive traditional test will be applied to that count for which injunctive relief is appropriate, while the looser Second Circuit test will be applied to the other counts.
It is clear that plaintiff is not entitled to a preliminary injunction with respect to four counts of its complaint. Count I alleges that defendants' actions have constituted an illegal tender offer, in violation of Section 14(d) of the SEA, 15 U.S.C. § 78n(d). Count II alleges that defendants have made fraudulent statements in connection with their alleged tender offer, in violation of Section 14(e) of the SEA, 15 U.S.C. § 78n(e). Counts IV and V raise similar claims under the Missouri TakeOver Bid Disclosure Act, § 409.500 et seq. R.S.Mo. (1975), and Section 203 of the Delaware General Corporation Law.
Plaintiff has made no showing that there are serious questions going to the merits of these counts so as to make them fair ground for litigation. Defendants' lengthy history of purchases was conducted almost entirely on the open market. The one purchase made off the exchange involved a normal block purchase transaction. This block purchase involved no solicitation of shares, no premiums offered, no time limit, and no minimum purchase contingency. On the record as it now stands, there is no way *1347 defendants' purchases could be considered a tender offer within the meaning of any of these statutes.
Regardless of the ultimate meaning ascribed to "tender offer" under the Williams Act, see, for example, "The Developing Meaning of Tender Offer Under the Securities Exchange Act of 1934", 86 Harv.L.R. 1250 (1973), this Court is certain that the situation presented here could not fall within that definition. The evidence adduced in support of this preliminary injunction showed no pressure whatsoever placed on the shareholders. Plaintiff, therefore, has not shown sufficiently serious questions going to the merits of these counts to warrant a preliminary injunction. Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195 (2d Cir.1978); Brascan Limited v. Edper Equities Ltd., [current] CCH Fed.Sec.L. Rep. ¶ 96,882 (S.D.N.Y.1979).
Furthermore, there are serious doubts as to the constitutionality of the state acts. The Delaware act has been struck down on preemption and commerce clause principles, Dart Industries v. Conrad, 462 F.Supp. 1 (S.D.Ind.1978), and similar arguments would be applicable to the Missouri Act. See, also, Great Western United Corp. v. Kidwell, 577 F.2d 1256 (5th Cir.1978), rev'd on other grounds ___ U.S. ___, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). This is a further reason why a preliminary injunction should not issue at this time. S-G Securities, Inc. v. Fuqua Inv. Co., 466 F.Supp. 1114 (D.Mass).
Plaintiff's remaining count is based on Section 13(d) of the SEA, 15 U.S.C. § 78m(d). Section 13(d) provides in substance, that any person who, directly or indirectly, becomes the beneficial owner of more than 5% of any registered security must, within ten days, file a Schedule 13D containing the information required by the rules and regulations. Schedule 13D includes, among the information to be disclosed, the following:
Item 4. Purpose of Transaction.
State the purpose or purposes of the acquisition of securities of the issuer. Describe any plans or proposals which the reporting person may have which relate to or would result in:
(a) The acquisition by any person of additional securities of the issuer, or the disposition of securities of the issuer;
. . . . .
(d) Any change in the present board of directors or management of the issuer, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board;
. . . . .
(j) Any action similar to any of those enumerated above.
Plaintiff asserts that defendants' plan to purchase up to 20% of Chromalloy's stock, to attempt to gain control of Chromalloy, and that they have had this intention from the beginning. In the amendments filed to the Schedule 13D, defendants have subsequently revealed that they intend to eventually purchase 20% of Chromalloy's stock. Defendants, though, continue to deny any intent to seek control of Chromalloy.
The Williams Act was enacted for the protection of investors. It is intended to ensure that corporate investors, when faced with a tender offer or possible change in control, will have complete information so as to be able to make an informed judgment. Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Cattlemen's Investment Company v. Fears, 343 F.Supp. 1248 (W.D.Okl.1972). As a remedial statute, it is to be liberally construed. Id.
The issue presented at this time is whether plaintiff has demonstrated a substantial likelihood that it will ultimately prove defendants' intent to take control. "Control" is an amorphous concept. Plaintiff's expert could not describe what constitutes control, but stated that he knew it when he saw it. The best description he could give was "a combination of arithmetic and influence".
The applicable SEC regulations describe "control" as follows:

*1348 (f) Control. The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. 17 C.F.R. § 240.12b-2(f) (1978).
This definition was elaborated upon in Graphic Sciences, Inc. v. International Mogul Mines, Ltd., 397 F.Supp. 112, 125 (D.C.D. C.1974), as follows:
This definition clearly indicates that the notion of control is not limited to cases in which a person has or seeks ownership of a majority interest in an issuer's securities or majority representation on a board or directors. The realities of commerce are determinative. Acting working control is the key, whatever may be the basis for that control.
A strict interpretation of the term "control" would not be in keeping with the remedial nature of the Williams Act. The fact that Sun intends to purchase only 20% of Chromalloy, and seeks only one or two members on the seventeen member board, is therefore not determinative of this issue.
From the time Alexander first became interested in Chromalloy, he was continually interested in the splits on the board. He exhibited a constant interest in how to exert influence over the board, once he became a member. He has campaigned for the selection of Leon Toups as Chief Executive Officer, a man he has indicated he could control. In addition, the course followed by Alexander and Sun is similar to dealings in the past by those parties through which they took over, or attempted to take over, other corporations. Such evidence is probative of Alexander's intent and should not be ignored. Gulf & Western Indus., Inc. v. Great A & P Tea Co., Inc., 476 F.2d 687 (2d Cir.1973).
It seems likely, in view of the evidence adduced thus far, that Alexander and Sun have had the intent to "control" Chromalloy from the beginning, as that term should be construed. Defendants have intended to exert considerable influence over the Board of Directors of Chromalloy, and, through this influence, direct the policies and management of Chromalloy. Plaintiff, therefore, has sustained its burden of showing probable success on the merits.
Of course, plaintiff must also show possible irreparable injury before it is entitled to a preliminary injunction. Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 95 S.Ct. 2069 (1975). In Rondeau, the Court held that equitable relief was inappropriate where the misleading Schedule 13D had subsequently been corrected. Such a holding is directly applicable in the present situation; if defendants amend their Schedule 13D to properly reflect their intention, absent unforeseen contingencies, to attempt to ultimately obtain control of Chromalloy injunctive relief would be inappropriate.
An injunction will lie until such time as defendants amend their Schedule 13D to adequately express that intention. The purpose of the Williams Act is to insure that investors have complete information before they must make a decision whether o sell their securities. Id. Under such circumstances, the continuing violation of the Williams Act presents irreparable injury.
As the very raison d'etre of Section 13(d) was thwarted by appellants' continued failure to disclose the statutorily required information, we discover no error in the decision that irreparable injury would occur to shareholders and the investing public if appellants were allowed to continue their activities without correcting and amplifying their Schedule 13D. General Aircraft Corp. v. Lampert, 556 F.2d 90, 96-7 (1st Cir.1977).
Therefore, defendants will be enjoined from acquiring further shares of Chromalloy stock or proxies or consents or soliciting or attempting to acquire the same, until they amend their Schedule 13D to the satisfaction of the Court. They will be further enjoined from further violations of Section 13(d) of the SEA, 15 U.S.C. § 78m(d), and from failure to amend their Schedule 13D. Id.
*1349 Further injunctive relief is inappropriate. Plaintiff requests that defendants be required to divest all shares they have acquired, and asks this Court to declare that plaintiff need not transfer to defendants shares previously purchased. To the extent that the price of Chromalloy stock was effected by the misleading statements in defendants' Schedule 13D, there is an adequate remedy at law for those who bought or sold. Rondeau, supra. Therefore, the above stated relief is all that will be granted at this time.