**The TRANE COMPANY, Plaintiff,**

v.

**O'CONNOR SECURITIES, et al.**

**O'CONNOR SECURITIES, et al.,
Counterclaimants,**

v.

**The TRANE COMPANY, et al.,
Counterclaim Defendants.**

**No. 82 Civ. 4668 (RLC).**

United States District Court,
S.D. New York.

March 31, 1983.

Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiff The Trane Co.; Edmund H. Kerr, Judith A. Ripps, Neil P. Forrest, Nancy E. Schwarzkopf, New York City, of counsel.

Kramer, Levin, Nessen, Kamin & Soll, New York City, for defendants O'Connor Securities and O'Connor Associates; Daniel P. Levitt, Greg A. Danilow, Scott D. Heller, Andrea M. Likwornik, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

The Trane Company ("Trane"), principally engaged in the manufacture and sale of air conditioning equipment, is a Wisconsin corporation with its principal place of business in La Crosse, Wisconsin. Trane's common stock is traded on the New York and Midwest stock exchanges, and as of April 20, 1982, Trane had approximately 10,201,-788 shares of common stock outstanding held by 4,400 shareholders of record.

Defendants, O'Connor Securities ("Securities") and O'Connor & Associates ("Associates") (collectively "O'Connor") are Illinois limited partnerships. Securities is authorized to engage in the business of trading in securities, and Associates is authorized to engage in the business of options and contracts relating to securities. Together defendants engage in the business of "risk arbitrage" which is the purchase and sale of the securities of companies involved in extraordinary transactions, such as reorganizations, liquidations, mergers and tender offers.

In or about January, 1982, Lawrence Lambert and Ann Carmel, O'Connor general partners chiefly responsible for oversight and operation of defendants' risk arbitrage business, regarded Trane as a likely candidate for a possible take over effort. Accordingly, in their view the purchase of Trane's shares presented a premium investment potential for O'Connor. In reliance on Lambert's and Carmel's evaluation, defendants lost no time embarking on a program of acquiring a sizable position in Trane common stock. Defendants hoped to realize a profit on their purchases either through a merger, a tender offer by a third party or by selling back to Trane the shares the partnerships had bought. As of the time of this proceeding, Securities was beneficial owner of 514,000 (5.04%) shares and Associates was the beneficial owner of 1,051,300 (10.3%) shares of Trane's outstanding stock.

On June 28, 1982, defendants filed their original Schedule 13d with the Securities and Exchange Commission pursuant to § 13(d) of the Exchange Act, 15 U.S.C. § 78m(d)(1). Subsequently, six amendments were certified (on July 7, July 13, July 19, August 20, September 1 and September 17—all in 1982—respectively) to the Schedule 13d pursuant to Rule 13d–2, 17 C.F.R. § 240(d)–2 (1982) and filed.

Item 3 of Schedule 13d reads as follows: *Source and Amount of Funds or Other Consideration.*

As of the close of business on June 25, 1982, Securities owned 499,000 shares of Common Stock which it purchased for an aggregate consideration of $14,552,-762.50 (excluding brokerage commissions). As of the close of business on June 25, 1981, Associates owned 323,900 shares of Common Stock which it purchased for an aggregate consideration of $10,017,337.50 (excluding brokerage commissions). The funds used by each Reporting Person for its purchase of such shares were obtained from such Report-

ing Person's working capital and from the proceeds of demand loans made by one or more banks in the ordinary course of business. Such loans bear interest at the brokers' "call rate", from time to time in effect. Although no shares of Common Stock are now pledged, from time to time in the past Common Stock and other securities had been pledged and Common Stock and other securities may be pledged from time to time in the future to secure borrowings.

Item 4 reads as follows:

*Purpose of the Transaction.*

The Reporting Persons have acquired their shares of Common Stock for investment. The Reporting Persons' objective is to sell such shares, together with any additional shares they may acquire, at profit.

The Reporting Persons may acquire additional shares if to do so would present an opportunity for profit. The Reporting Persons may sell their shares to any person, including the Issuer.

If the Reporting Persons have not sold their shares in the near term, they may attempt to interest the Issuer or other parties in a transaction that could result in disposition of the Reporting Persons' shares at a profit. Although no decision has been made to do so, the Reporting Persons may utilize a tender offer or other means to seek control of the Issuer in order to achieve their investment objective. If the Reporting persons were to seek and acquire control of the Issuer, they would undertake to sell their shares, sell or merge the Issuer or otherwise pursue their investment objective. They would not attempt to influence or change the Issuer's on-going business.

Except as set forth in this Item 4, neither the Reporting Persons nor the General Partners have any plans or proposals nor are they aware of any, which would result in any of the events enumerated in clauses (a)–(j) of Item 4 of Schedule 13D. In the future, however, the Reporting Persons may formulate such plans or proposals.

The language in Schedule 13d was authored and on June 25, 1982, executed and certified as true and complete by Lawrence Lambert. Despite the equivocal "may acquire additional shares" statement in Item 4, on June 28, 1982, and June 30, 1982, a total of 47,600 shares of Trane stock were bought by O'Connor. On July 8, immediately subsequent to certifying the first amendment to the Schedule 13d, which made no modification of the language recited in Item 4, O'Connor purchased 46,700 shares of Trane stock. On July 9, 1982, O'Connor offered to buy 1,850,000 shares of Trane stock which were acquired by General Electric Corp. On July 13, the second amendment to Schedule 13d was certified again without modification of the above cited language in Item 4. Nonetheless, on July 14, O'Connor sought unsuccessfully to purchase several thousand shares of Trane stock but did succeed on July 16 in purchasing 547,000 Trane shares.

THE ISSUES

Plaintiff contends (1) that O'Connor, in the acquisition of Trane securities between January, 1982, and September, 1982, engaged in activities constituting market manipulation in violation of Sections 9(a)(2) and 10(b) of the Exchange Act, 15 U.S.C. § 78i(a)(2)[1] and 78j(b);[2] (2) that O'Con-

1. Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2) provides in pertinent part:
   It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange— . . .
      To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

2. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) provides in pertinent part:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . .

nor's original Schedule 13d and the various amendments violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d)(1)[3] in that these statements failed to make fair and accurate disclosures; and (3) that the aforesaid violations also constituted violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; and (4) that as a result, Trane, its employees, shareholders and franchisees have suffered and will continue to suffer irreparable injury. Plaintiff's Post Trial Memorandum at 2 *et seq.*

Plaintiff seeks an order from this court prohibiting any further purchases of Trane stock by O'Connor, prohibiting O'Connor from voting their stock and barring the sale by O'Connor of the partnerships' Trane portfolio except pursuant to a court approved plan of divestiture. *Id.* at 44 *et seq.*

## DETERMINATION

### Market Manipulation

■ Plaintiff's contention that defendants have violated Section 9(a)(2) of the Exchange Act is not supported on this record. It is, of course, true that O'Connor engaged in active trading in Trane stock between January and September, 1982. During that nine month period defendants moved from a position of zero holdings in Trane stock to a total acquisition of approximately 1.5 million Trane securities. Defendants' holdings now contain roughly 15% of all Trane's outstanding stock. This level of trading activity undoubtedly affected the price of the stock and induced purchases by others. Indeed, Robert Nye, an expert for plaintiff, testified that the activity in the stock caused him to enter the market.

It is also clear that O'Connor was convinced that Trane was a ready target for unusual corporate activity in the form of a merger, take over or tender offer. Lawrence Lambert and Ann Carmel, O'Connor general partners, had primary responsibility for finding risk arbitrage situations ripe for profitable investment. The impulse to concentrate on the acquisition of a large holding in Trane was initiated by Lambert and Carmel. The O'Connor-Trane acquisitions that Lambert and Carmel orchestrated were designed to help bring more quickly to fruition the interest which would trigger the corporate activity their research told them was bound to occur. The record can be fairly read as establishing that O'Connor gambled on investing $50 million in the purchase of 1.5 million Trane securities in the hope and belief that they would be able to sell those shares to third parties or to Trane at a sizeable profit.

I am not convinced, however, that any federal securities laws have been violated in the market activity defendants engaged in in acquiring the Trane securities. The central purpose of section 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price. *Chris-Craft v. Piper Aircraft,* 480 F.2d 341, 383 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d

To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d)(1) provides in pertinent part:

Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l* (g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

148 (1973). O'Connor purchased and sold stock through open market channels. There is no evidence that defendants were responsible for any simulated pink sheet activity, nor has there been any evidence of the collapse of the market after O'Connor's active trading subsided. *Cf. SEC v. Resch-Cassin & Co.,* 362 F.Supp. 964, 967–73 (S.D. N.Y.1973) (Tenney, J.). O'Connor's purpose was not to create an artificial demand for Trane stock nor to induce public investment to its detriment. Defendants simply engaged in these Trane transactions in the expectation of a profit. Defendants did not "[dominate] the market in ... [the] ... stock for the purpose of conducting a one sided market at an artificial level for its own benefit and to the detriment of the investing public." *See Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 794 (2d Cir.1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). If what defendants did constituted manipulation within the meaning of Section 9(a), most large scale transactions in a single security would be prohibited. That was clearly not the purpose of Congress. It sought to protect the small investor by maintaining a market controlled by natural forces rather than by intervention of artificial manipulative devices which would distort the market to the detriment of the investing public.

The acts which plaintiff cites as evidencing specific examples of manipulation are not proof of illegal conduct. Herbert Seif, O'Connor's chief trader, was under specific instructions from Michael Greenbaum, the managing partner of O'Connor, not to acquire 5% or more of Trane's outstanding stock except on explicit direction from Greenbaum. The 5% benchmark was approached on May 11. Between May 11 and June 16, 1982, when Seif was permitted to exceed the 5% limit, O'Connor sold 51,000 and purchased 57,000 Trane shares. Plaintiff argues that these transactions are clear evidence of manipulation; that O'Connor was churning the market and that buying 57,000 shares and selling 51,000 shares had no purpose other than to give the appearance that there was active trading in Trane securities.

Plaintiff's own expert on risk arbitrage, Richard Nye, however, does not support that conclusion. He testified that it was not unusual to engage in both purchase and sale transactions while maintaining what he called a core position in a security. In the process of accumulating a position, "it's quite common," he stated, "for the stock to move up out of range", (TR. 231) and in those circumstances one would be inclined "to sell some stock, with the hope of buying it back later at a lower price resulting in a net cost which is to [one's] benefit." *Id.* He concluded that selling and buying "is a frequent occurrence in this business particularly when the strategy is to accumulate a position over a period of time." *Id.* Relying on the expertise of plaintiff's witness, the May 11-June 16 buy-sell activities have no Section 9(a) significance.

On April 20 and 22, and on May 20, O'Connor bought and sold the same number of Trane shares. Plaintiff contends that these were matched sales, and categorizes the May 20 transactions as a wash sale. Even assuming that plaintiff had established these contentions by a predominance of the evidence, they are at best minor incidents which cannot give a taint of illegality to O'Connor's legitimate acquisition of 1.5 million Trane shares in roughly nine months of trading. The incidents have to be dismissed as happenstance. Moreover, plaintiff has failed to establish that the May 20 transaction was a wash sale, which I understand to mean the sale and purchase back of identical shares. The fact that a trader on a given day buys and sells the same number of shares is not to be categorized as a matched sale unless the trader bought and sold the identical securities. The proof does not establish that this occurred. A series of trades on both sides with no net gain or loss on the buy or sell side could be a mere coincidence. To prove a wash sale, plaintiff's proof would have to show e.g. that defendants bought 100 shares and then immediately sold these identical 100 securities. Plaintiff's proof falls far short of that.

In sum, the proof is insufficient to support a finding that defendants engaged in market manipulation forbidden under § 9(a)(2) of the Exchange Act. Since plaintiff relies on its proof of market manipulation to establish its claimed violation of Section 10(b), that claim must also fail.

*Claimed RICO Violations*

■ Trane argues that O'Connor's activities constitute violations of RICO, 18 U.S.C. §§ 1961–1968, and seek injunctive relief under that statute. One apparent reason for the invocation of RICO is that injunctive relief can be secured without a showing of irreparable harm. *United States v. Cappetto,* 502 F.2d 1351, 1357–59 (7th Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975).

The threshold question for consideration is whether a private party may maintain an action for injunctive relief under RICO. 18 U.S.C. § 1964(c) authorizes a private party "injured in his business or property by reason [of activities condemned by the statute] to sue therefor in any appropriate United States district court and [to] recover threefold the damages he sustains and the cost of the suit including attorney's fees." Section 1964(b) authorizes the Attorney General to institute actions for injunctive relief.

Plaintiff supplies no authority to support its invocation of RICO for the purpose of securing injunctive relief against O'Connor. *United States v. Cappetto, supra,* on which plaintiff relies, is an action brought by the Attorney General, not by a private party. The Attorney General's authority to seek injunctive relief is explicit. It does not follow that this explicit authorization empowers Trane to seek injunctive relief as well.

Plaintiff cites Blakey-Gettings, "Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies," 53 Temple L.Q. 1009, 1014, 1038 nn. 132–33 (1980). Plaintiff's Post Trial Memorandum at 43, n. 14. The authors state boldly that equitable relief is available to a private party but cite no cases on point. In footnote 197 at 1047 it is stated that Congressman Sam Steiger of Arizona, who offered an amendment to clarify the scope of remedies for private actions, felt that a right to private injunctive relief existed in the bill, although he subsequently withdrew the amendment which would have left no doubt about the matter.

We have found only one case granting injunctive relief to a private party under RICO. In *Aetna Casualty and Surety Co. v. Liebowitz, etc., et al.,* 81 Civ. 2616, an unreported opinion, read into the record from the bench, Judge Pratt (then sitting in the Eastern District of New York but since elevated to the Court of Appeals) granted a preliminary injunction restraining defendants' activities pending a trial and final resolution of the matter.

The court found that the defendants had engaged in a course of conduct to manipulate the bureaucratic requirements and restrictions with which the New York State Insurance Plan burdens insurers in such a way as to reap considerable financial benefits at the expense of the insurers, finance companies and the insureds in some cases. It also found that defendants had engaged in a pattern of racketeering within the meaning of RICO. On that basis injunctive relief was granted. The court did not address the issue of the suitability of injunctive relief for private plaintiffs under RICO. The opinion implicitly assumed the availability of such relief.

In the most recently decided case, *Dan River v. Icahn,* 701 F.2d 278 (4th Cir.1983) in which injunctive relief was sought by a private party under RICO, the court declined to rule on the issue. It did, however, express some reservations in stating:

There is substantial doubt whether RICO grants private parties such as Dan River a cause of action for equitable relief. Section 1964(c) grants private parties a right of action for treble damages against the RICO offender, but the section has nothing to say about injunctive relief. Subsection (b) of Section 1964 permits the attorney general to bring proceedings under the Act, and that provision—in sharp contradistinction to § 1964(c)—allows for equitable relief.

To sustain the district court's order on RICO grounds, then, Dan River must establish that actions for equitable relief are implied in the statute. While we do not undertake to resolve the question, nevertheless, the probability of success is affected adversely by the very existence of the uncertainty ... *Id.* at 290.

*Aetna Casualty and Surety Co., supra,* the sole decided case found to support plaintiff's position, provides scant authority for a firm conclusion that injunctive relief is available to private plaintiffs. Although relief was granted, Judge Pratt gave no reasons therefor. The case provides no rationale for a holding that RICO entitles a private party to obtain injunctive relief. On the other hand, it is noteworthy that both the Fourth Circuit in *Dan River,* and the Eighth Circuit in *Bennett v. Berg,* 685 F.2d 1053, 1064 (1982), expressed serious doubts concerning the propriety of granting injunctive relief to private plaintiffs alleging violations under RICO.

A full discussion of the ramifications of RICO would require a vast expansion of this opinion. I have serious doubt that Trane may properly invoke RICO to secure injunctive relief against O'Connor. However, I need not reach that issue. Since the activities of O'Connor have been held not to violate Section 9(a) or 10(b) of the Exchange Act, these activities surely do not come within the ambit of RICO's proscriptions. Accordingly, the claims under RICO must be dismissed.

*The Schedule 13d and Amendments*

■ Plaintiff's contention that defendants' Schedule 13d and amendments did not amount to the full disclosure required by law and regulation is more persuasive. Plaintiff argues that O'Connor's equivocal statement in the original Schedule 13d about the decision to require more Trane stock that was unchanged in the subsequent amendments was patently false in light of trading activity that occurred on the trading days following the certification and filing of the Schedule 13d and relevant amendments. Plaintiff also argues that O'Connor's statement that it might make a tender offer was false, since doing so is totally at odds with O'Connor's past practices in similar situations. Plaintiff also contends that as of July, 1982, O'Connor was financially incapable of making a tender offer for Trane. In addition, plaintiff complains that Item 3 gave insufficient details concerning O'Connor's financial arrangements for the purchase of the Trane stock.

The evidence is clear that O'Connor had decided as of January, 1982, to accumulate a substantial position in Trane. No decision was made to exceed 5%, thus triggering the Schedule 13d filing, until just before June 16, 1982. Seif was under orders to keep O'Connor's holdings below 5% until he received instructions from Greenbaum to proceed further. However, once the decision to pass the 5% threshold was made, it is inconceivable that O'Connor was not committed to further large accumulations. While there is no evidence that O'Connor had decided upon acquiring a set percentage of Trane stock at the time the Schedule 13d was certified and filed, it is doubtful that the lack of a decision as to the extent of the partnerships' investment in Trane warranted the equivocal statement in the Schedule 13d that additional shares may be acquired. *Cf. Otis Elevator Co. v. United Technologies,* 405 F.Supp. 960, 971 (S.D.N.Y.1975) (Pierce, J.) [merger plans were not inchoate but were sufficiently developed to require disclosure], *but see Todd Shipyards v. Madison Fund,* 547 F.Supp. 1383, 1387–89 (S.D.N.Y.1982) (Pollack, J.); *Chromalloy v. Sun Chemical Corp.,* 611 F.2d 240, 248 (8th Cir.1979). Lambert on June 25, 1982, certified the truthfulness and accuracy of the Item 4 statement, but on June 28 when the Schedule 13d was filed and thereafter on June 30, Seif was in the market accumulating additional large blocks of Trane stock. I cannot credit a representation that defendants had not made a firm decision before June 25, 1982, to continue to amass large blocks of Trane stock. In two days some 47,600 shares were bought. On July 7, the first amendment to Schedule 13d was certified. The "may acquire" language was

not modified. On July 8, defendant bought 46,700 shares of Trane and on July 9 offered to purchase 1,850,000 shares. The decision to stay in the market accumulating additional Trane holdings was surely set before the amendment was certified and filed. On July 13, the second amendment with no modification in the "may acquire" representation was certified. On July 14, defendants sought to make a large acquisition but were unsuccessful. On July 16, defendants added 574,000 Trane shares to their portfolio. · It is clear that defendants were definitely committed well in advance of the indicated acquisitions to purchase whatever amounts of Trane's shares that became available. Defendants were under a legal obligation to make clear in their Schedule 13d and its amendments that they were committed to further available purchases. In failing to do so, the filings were false and misleading.

The Schedule 13d also carries a statement suggesting the possibility of defendants making a tender offer for control of Trane. That possibility seems so remote and so at variance with O'Connor's usual activities that it would also appear to be misleading, *see Transcon v. A.G. Becker,* 470 F.Supp. 356, 378 (S.D.N.Y.1979) (Sand, J.); *but cf. Chromalloy v. Sun Chemical,* 474 F.Supp. 1341, 1348 (E.D.Mo.1979) [court found that course followed by defendants was similar to their dealings in the past where they took over or attempted to take over other corporations]; *Kirsch v. Bliss & Laughlin Industries,* 495 F.Supp. 488, 501 (W.D.Mich. 1980) [defendant's past practice of acquiring "niche companies" was probative of a present intent to takeover merely than to invest in the plaintiff].

Greenbaum testified that at the time of the filing of the Schedule 13d, making a tender offer was highly unlikely. No discussion had been held with any financial institutions about underwriting a tender offer for Trane. Prior to the Schedule 13d filing Greenbaum does not recall any discussions with his partners on the subject, and no discussions were held with any investment bankers about making a tender offer. Greenbaum stated that he believed there had been one meeting with counsel about a tender offer but was not certain whether any documents had been prepared. There had been no discussion among the partners associated with the Trane transaction after June 25, 1982, about making a tender offer. The partners did consider that their filing a Schedule 13d might cause Trane to buy back their shares or a third party to make a tender offer, and they discussed the circumstances under which such a third-party tender offer might be made. Greenbaum stated that the most desirable result from O'Connor's vantage point was for Trane to buy O'Connor shares, the next was for the circumstances to be such as to enable O'Connor to sell at a profit, and finally the least attractive possibility was for O'Connor to seek to induce a higher price by starting a tender offer.

I cannot believe that O'Connor, which had never run a publicly owned manufacturing corporation, was ever seriously considering making a tender offer to secure control of Trane, except as a gambit to induce Trane to buy back defendants' holdings at a handsome premium or to secure a similar profit by means of an offer from a third party. The possibility of O'Connor actually making a tender offer was too slim to warrant its inclusion as an option under Item 4. To that extent the statement was misleading.

Plaintiff argues that as of August 6, 1982, defendants experienced a severe set back to their financial capabilities and that they could not have made a tender offer for Trane in any event. O'Connor, as of July, 1982, held 1.5 million shares of Cities Services stock. Plaintiff contends that the market value of these shares exceeded 50% of O'Connor's capital and that a substantial part of defendants' capital was pledged to Continental Bank & Trust Co., the partnerships' principal banker. On August 6, 1982, Gulf Oil Corp. announced the withdrawal of its tender offer, and Cities Services stock fell 25 points reducing O'Connor's net worth by some $35 million. Moreover, plaintiff asserts that Continental called a meeting to advise O'Connor on August 6, 1982, that

there was a shortfall of some $10 million in its collateral pledged as security to the bank. The shortfall violated the Bank's internal guidelines. Plaintiff argues that this shortfall still existed as of the time of the hearing, and that the financial liquidity difficulties O'Connor faced made it impossible for defendants to make a tender offer in August or September. Nevertheless, there was no modification or withdrawal of Item 4 in the Schedule 13d.

O'Connor disputes plaintiff's conclusions. On August 9, 1982, Continental issued a public statement that O'Connor's line of credit was fully secured and underutilized. While there is evidence that there was a collateral shortfall in O'Connor's account with Continental of $7 million, as of July it had a line of credit of $110 million with the bank. Moreover, when Cities Services dropped 25 points, Trane shares fell to $22. In addition defendants assert that the Cities Services situation was temporary. Shortly after August 6, Cities Services' stock climbed from $30 a share to $35–$38. Occidental then made a tender offer which propelled the stock up to $50 a share, and in September, O'Connor traded 1.2 million of its shares at $55 per share. Thus, the decrease in O'Connor's net worth between August 6 and the time Occidental made its tender offer was a paper setback and a temporary one at that.

Plaintiff has not demonstrated that O'Connor's financial capabilities were such in the brief interval involved to require a modification of Schedule 13d. The situation was too volatile. Defendants were entitled to wait to see whether when the shock of Gulf Oil's pull out faded, the situation warranted a modification in the Schedule 13d.

Nor am I persuaded that Item 3 of the Schedule 13d is improper. Defendants are not required to describe, in the detail plaintiff suggests, the financial transactions which defendants undertook to secure funds to buy the Trane stock. *See generally, Standard Metals, Corp. v. Tomlin,* 503 F.Supp. 586, 604 (S.D.N.Y.1980) (Motley, J.). There is no need for O'Connor to describe the terms of the loans, dates taken out, the collateral utilized to secure them, etc. These are private details which would be of no interest to a shareholder. Moreover, the details of the loan arrangements are probably confidential business information which O'Connor should not be required to expose as a matter of course. *Id.* Naturally, if such information became essential to vindicate plaintiff's right, exposure might be warranted. *See generally, Rondeau v. Mosinee Paper,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). Moreover, plaintiff does not need this information for this litigation. It does not question the fact that the money O'Connor secured to finance the Trane transactions was secured in legitimate business dealings with defendants' bank and other financial institutions.

*Irreparable Injury*

While I find that the Schedule 13d statements that O'Connor may purchase additional Trane shares and might make a tender offer are misleading, and to that extent the Schedule 13d and the various amendments do not comply with the requirements of Section 13(d) of the Exchange Act, plaintiff has failed to show that its customers or shareholders have suffered irreparable harm.

Thomas Kelly, a franchisee, voiced at trial his anxiety and concern about the source of his supply because of O'Connor's large position in Trane. William Roth, chief executive of Trane, focused on diversion of management from other important concerns and confusion caused to employees by O'Connor's acquisition. There is, however, no nexus between O'Connor's overreaching Schedule 13d statements and Kelly's anxieties, Roth's concerns or employee confusion. The concern of management, the anxiety of the franchisees, and the confusion of employees and shareholders all result from the large position O'Connor had secured in Trane stock. These problems all relate to the possibility of a change in management. However, the federal securities laws were never intended to shield management from ouster or to prevent a power struggle by a group of shareholders for control. *Rondeau*

*v. Mosinee Paper, supra,* 422 U.S. at 58, 95 S.Ct. at 2075. There is nothing in the Schedule 13d or its amendments to mislead franchisees, employees or shareholders as to the extent of O'Connor's holdings in Trane stock.

While there are two alternative bases in this circuit for grant of preliminary injunctive relief—likelihood of success on the merits and a fair grounds for litigation on the merits with the balance of hardships tipping in favor of the party seeking relief—in either case the failure to show irreparable harm is fatal. *See e.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). *See also Rondeau v. Mosinee Paper, supra,* 422 U.S. at 65, 95 S.Ct. at 2079.

Accordingly, the motion for a preliminary injunction to prohibit defendants from accumulating more Trane stock, from voting the stock they have acquired and from disposing of it except under court order is denied.

IT IS SO ORDERED.